UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **DARLA SLAGH, Ph.D.** | : | Case No. 1:22-cv-691 |
| 266 Indian Pointe Dr. | : | |
| Maineville, OH 45039 | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **JOSEPH HOUSE, INC.** | : | |
| 1526 Republic St. | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| **Defendant.** | : | |

**COMPLAINT AND JURY DEMAND**

Plaintiff Darla Slagh, for her Complaint against Defendant Joseph House, states as follows:

### I. PRELIMINARY STATEMENT

1. This is an action arising out of Plaintiff Darla Slagh's employment with Joseph House. Slagh alleges that Joseph House terminated her in violation of the False Claims Act, 31 U.S.C. § 3730(h). Specifically, Dr. Slagh alleges that Joseph House terminated her because of her efforts to stop one or more violations of the False Claims Act.

2. Dr. Slagh seeks relief for the aforementioned acts and/or omissions in the form of compensatory damages for both her economic and non-economic injuries. She also seeks liquidated damages, punitive damages, and her reasonable attorney fees and costs in prosecuting this matter.

1

## II. JURISDICTION AND VENUE

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 to secure protections and redress deprivations of rights conferred by the False Claims Act.

4. Venue with this Court is appropriate because all or part of the claim for relief arose in the Southern District of Ohio.

## III. PARTIES

5. Plaintiff Darla Slagh, Ph.D. is a United States citizen and a resident of Maineville, Ohio. Slagh was employed as the Clinical Director for Joseph House.

6. Defendant Joseph House, Inc. ("Joseph House") is a company located in Cincinnati, Ohio that provides residential services, mental health care, and other services to homeless male veterans. Joseph House submits claims to to obtain federal funds for medical care provided to its patients.

## IV. STATEMENT OF THE CASE

7. Dr. Slagh began her employment with Joseph House in May 2022.

8. As Clinical Director, she worked pursuant to an employment contract under which she was responsible for overseeing the work of mental health professionals providing mental health care to Joseph House's patients.

9. The counselors Joseph House employed did not have sufficient licensure to bill Medicaid directly for their services. Instead, they operated under her direction and under her license.

10. As a condition of billing for the services of such counselors, law requires that they meet certain requirements, including having weekly supervisory meetings with Dr. Slagh.

11. At all times, Dr. Slagh was responsible for the work of the counselors at Joseph House.

12. In the course of Dr. Slagh's employment, she uncovered several instances of fraudulent billing occurring at Joseph House, including: a) a counselor, Jim Engelhardt, was billing for counseling sessions he did not provide; b) Joseph House was double billing the Ohio Department of Medicaid for urinalysis services; and c) Katie Waits, the Program Director at Joseph House who also provided counseling services to patients, was not complying with requirements that she undergo clinical supervision with Dr. Slagh.

<u>a. Jim Engelhardt Fraudulently Reported And Billed
For Seeing Patients He Did Not See</u>

13. On or about June 1, 2022, shortly after starting at Joseph House, Dr. Slagh reported to Katie Waits, the Program Director at Joseph House, that she believed a counselor employed by Joseph House, Jim Engelhardt, was committing Medicaid fraud.

14. Specifically, Dr. Slagh reported that Mr. Engelhardt appeared to be billing Medicaid for sessions that never occurred and/or billing for sessions in greater intervals of time than the actual length of the sessions.

15. Dr. Slagh also concluded that Mr. Engelhardt was billing for group sessions he reported were attended by individuals who were no longer patients of Joseph House.

16. Dr. Slagh arrived at this conclusion after observing that Mr. Engelhardt's verbal reports of his activities to her often did not match the time he had entered into Joseph House's computerized billing system.

17. Ms. Waits responded that Dr. Slagh must be incorrect because she did not believe that Mr. Engelhardt would engage in Medicaid fraud. Ms. Waits suggested that Dr. Slagh did not understand Joseph House's computerized billing system.

18. In the ensuing weeks, Dr. Slagh continued to monitor Mr. Engelhardt's work and billing practices.

19. In addition to having further suspicions that Mr. Engelhardt was billing for work he did not perform based on his verbal reports, she also learned of complaints from at least two patients that they had not seen Mr. Engelhardt despite Mr. Engelhardt billing for meeting with the patient.

20. Dr. Slagh reported these additional complaints to Ms. Waits. Ms. Waits said that Mr. Engelhardt had reported seeing one of the patients four times in the last three weeks and accused the patient of lying in order to obtain a new counselor.

21. In July 2022, Joseph House confirmed that Mr. Engelhardt was fraudulently billing for services he did not provide. Mr. Engelhardt admitted to billing fraudulently.[1]

22. Joseph House terminated Mr. Engelhardt.

23. On August 21, 2022, Dr. Slagh told Alicia Patterson, the Executive Director of Joseph House, that she had reported her concerns about Mr. Engelhardt's fraudulent billing to Ms. Waits, but that Ms. Waits had done nothing in response.

24. Ms. Patterson became agitated and cautioned Dr. Slagh against making such an accusation against Ms. Waits.

25. Dr. Slagh reported Mr. Engelhardt's fraudulent billing to the State of Ohio's Board of Counselors on or about August 10, 2022.

### b. Joseph House Double-Billed The Ohio Department Of Medicaid For Urinalysis Services

26. Dr. Slagh separately discovered that Joseph House was, perhaps inadvertently, double-billing Medicaid for urinalysis services performed on patients. Specifically, she discovered that providers were entering urinalysis services into Joseph House's billing

---

[1] In addition to Mr. Engelhardt's neglect of his obligations resulting in billing fraud, it also resulted in tragedy. One of Joseph House's patients, who was assigned to Mr. Engelhardt for counseling services and who did not receive those counseling services, committed suicide.

system when performed. The providers were entering inconsistent lengths of time for these services.

27. As a result, Dr. Slagh conferred with Brandon Cooper, who was responsible for overseeing the providers who conducted the urinalysis. Mr. Cooper responded that the providers should not be billing for a urinalysis at all because he billed for them all at once each month.

28. On August 21, 2022, Dr. Slagh reported this urinalysis issue to Executive Director Patterson. Ms. Patterson agreed that Joseph House was double billing for the services.

29. When Dr. Slagh followed up with the providers about the error in order to ensure double-billing did not happen in the future, they told her that they had been instructed to tell Dr. Slagh they had never billed for a urinalysis. Dr. Slagh knew that to be untrue.

<u>c. Dr. Slagh Reported That Katie Waits Was Not Undergoing Clinical Supervision, Which Was Necessary For Joseph House To Bill For Her Services</u>

30. On August 26, 2022, Dr. Slagh reported to Ms. Patterson that Ms. Waits, who provided counseling services in addition to her managerial duties, was not scheduling weekly supervisory meetings with Ms. Slagh, which were required for Joseph House to bill Medicaid for Ms. Waits's services and to otherwise comply with state and federal law.

31. Ms. Patterson ignored Dr. Slagh's concerns saying that Ms. Waits was attending the weekly clinical meeting, which satisfied the requirement and that Joseph House had a waiver that exempted Ms. Waits from attending such meetings.

32. Neither of Ms. Patterson's claims was true.

33. The weekly clinical meetings were attended by more individuals than permitted under the law for clinical supervision meetings. Moreover, Joseph House never presented

a waiver it claimed to have obtained for Ms. Waits to bill for her services without clinical supervision.

### d. Joseph House Terminated Dr. Slagh

34. On August 31, 2022, Joseph House terminated Dr. Slagh. It claimed that it was terminating her for allegedly:

  a. Failing to report suspicions that Mr. Engelhardt had been drinking on the job; and

  b. Disclosing information about Mr. Engelhardt's fraudulent activity to other counselors at Joseph House.

35. Joseph House did not confront Dr. Slagh with these allegations prior to terminating her employment.

36. Dr. Slagh did not suspect Mr. Engelhardt was drinking on the job and did not tell anyone that she had such suspicions.

37. Dr. Slagh also did not disclose to any Joseph House employees any facts about Mr. Engelhardt's fraudulent scheme or termination.

38. Joseph House terminated Dr. Slagh in retaliation for efforts she took to stop one or more violations of the False Claims Act.

39. Joseph House terminated Dr. Slagh within 10 days of her reporting to Ms. Patterson that: a) Ms. Waits had repeatedly ignored Dr. Slagh's reports that Mr. Engelhardt was engaging in fraudulent billing; b) Joseph House had been double-billing the Ohio Department of Medicaid for urinalysis services; and c) Ms. Waits was not attending weekly clinical supervision meetings with Dr. Slagh.

## V.  STATEMENT OF THE CLAIMS

### COUNT 1: DISCRIMINATION
### (31 U.S.C. § 3730(h))

40. Dr. Slagh incorporates the preceding paragraphs as if fully rewritten herein.

41. Dr. Slagh was qualified for her position as Clinical Director at Joseph House.

42. Dr. Slagh engaged in protected activity by taking lawful action to stop one or more violations of the False Claims Act. Specifically, she objected to Joseph House's apparent fraudulent billing to the Ohio Department of Medicaid as set forth above.

43. Defendant knew that Dr. Slagh engaged in the protected activity.

44. As a result of her protected activity, Defendant discharged Dr. Slagh.

45. Joseph House's stated justification for discharging Dr. Slagh, that she failed to report suspicions that Mr. Engelhardt was drinking on the job and that she disclosed the specifics of Mr. Engelhardt's scheme to others within the company, is merely pretext for illegal discrimination.

46. As a result of Defendant's illegal actions, Dr. Slagh has suffered damages, including lost wages, lost benefits, and emotional distress.

47. Defendant acted with malice and a reckless disregard for Dr. Slagh's federally-protected rights.

### **PRAYER FOR RELIEF**

Wherefore, Dr. Slagh demands judgment against Joseph House as follows:

1. An award of two times Dr. Slagh's back pay and benefits;

2. Reinstatement, or if reinstatement is not practicable, an award of front pay.

3. an award of compensatory damages for all noneconomic damages suffered;

4. an award of Dr. Slagh's reasonable attorney fees and costs;

5. an award of punitive damages; and

6. an award of any other relief in law or equity to which Dr. Slagh is entitled.

        Respectfully submitted,

        **MEZIBOV BUTLER**

        /s/ Brian J. Butler
        Brian J. Butler
        615 Elsinore Place
        Cincinnati, OH 45202
        Phone: 513.621.8800
        Fax: 513.621.8833
        bbutler@mezibov.com

        *Counsel for Plaintiff Darla Slagh*

## **JURY DEMAND**

Plaintiff, by and through counsel, demands a trial by jury on all claims so triable.

        s/ Brian J. Butler
        Brian J. Butler